IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROBERT G. WING, as Receiver for VESCOR CAPITAL CORP., a Nevada corporation, et al., <br><br> Plaintiffs, <br><br><br> vs. <br><br><br> APEX HOLDING COMPANY, LLC, a Nevada limited liability company, and, APEX UTILITY HOLDING COMPANY, LLC, a Nevada limited liability company, <br><br> Defendants. | MEMORANDUM DECISION AND ORDER <br><br><br><br><br><br> Case No. 2:09-CV-00022 |

Before the Court is a Motion to Dismiss or Alternatively, to Transfer Venue filed by the

Defendants Apex Holding Company, LLC and Apex Utility Holding Company, LLC

(collectively, "Apex"). The Court held a hearing covering this motion on Wednesday, July 29,

2009, at which Apex was represented by Mark R. Gaylord and Melanie J. Vartabedian. The

Receiver, Robert G. Wing, was present and represented by M. David Eckersley. After review

and consideration of the arguments presented by counsel, the Court enters the following

Memorandum Decision and Order.

1

## I. Factual Background

This action is one of many arising out of the collapse of an alleged Ponzi scheme orchestrated and run by Val Edmund Southwick through a complex web of over 150 corporations and limited liability companies. On May, 5, 2008, the Court appointed Robert G. Wing as Receiver for VesCor Capital Corp., VesCor Capital, Inc., VesCorp Capital, LLC, VesCorp Capital IV-A, LLC, VesCorp Capital IV-M, LLC, and all affiliated limited partnerships, corporations or other business entities (collectively, "VesCor").

On January 13, 2009, the Receiver filed a Complaint against the Defendants seeking the return of assets transferred to them from VesCor as fraudulent transfers. In the alternative, the Receiver's Complaint alleged breach of contract and breach of good faith and fair dealing claims against the Defendants based upon the contracts entered into between the Defendants and the VesCor entities. Complaint, ¶ 1, dkt. 2.

The Receiver's Complaint sets out the factual predicate of the case as follows:

> 7. This action arises out of a Ponzi scheme. In or about 1990, Val Edmund Southwick ("Southwick") organized and operated companies referred to collectively as "VesCor." VesCor raised capital primarily through the sale of securities to investors. VesCor told investors their money would be used to fund the development of commercial and industrial real estate. In fact, VesCor used most of the money it obtained from new investors to pay the debts owed to older investors, to pay commissions on the sale of investments to sales agents, to fund company operations, and to underwrite Southwick's lifestyle.
>
> 8. In 1992, VesCor was sanctioned by the Utah Department of Commerce, Division of Securities ("Division") in a Stipulation and Consent Order wherein the Division alleged VesCor had sold unregistered securities to investors in the State of Utah.
>
> 9. In 2002, VesCor was again sanctioned by the Division in a Stipulation and Consent Order, which said VesCor sold unregistered securities to investors in the State of Utah.
>
> 10. In 2004, VesCor agreed with the Division to discontinue offering

securities for sale to Utah residents, and to cease making offers for the sale of securities from within the State of Utah to investors who resided out the State. VesCor further agreed to pay its current investors their principal and accrued interest at the maturity date of their investments or at an earlier call date.

11. VeSor contunied to sell unregistered securities in and from the State of Utah in violation of the Division's Orders and the 2004 agreement.

12. By 2006, VesCor had grown to a complex web of over 150 corporations and limited liability companies, registered in Utah and Nevada, and owned interests in commercial and industrial real estate in Nevada, Utah, Montana and California. On or about May, 31, 2006 the VesCor Ponzi scheme collapsed when Southwick stopped paying monthly interest payments and principal redemptions to most investors.

13. On March 31, 2008, Southwick pleaded guilty to nine counts of securities fraud, each a felony in the second degree, in the Third District Court of Utah, and was later sentenced by Utah District Court Judge Robin Reese to serve nine consecutive 1-15 year prison terms, the maximum allowed by State law.

14. On February 6, 2008, the United States Securities and Exchange Commission ("SEC") filed suit against Southwick and five VesCor entities. The SEC alleged violations of the anti-fraud provisions of the securities laws.

15. On May 5, 2008, this Court appointed Robert G. Wing as Receiver for the VesCor companies.

16. On December 24, 2008, this claim became part of the receivership estate upon judicial approval of a settlement agreement and order between the Receiver and Lewis B. Freeman, the Chapter 11 Trustee in bankruptcy for VesCor Development, LLC, ADL 1, LLC, IDL 9, LLC, and JDL 10, LLC. That bankruptcy was also dismissed on December 24, 2008.

*Id.* ¶ 7-16.

The Receiver's Complaint then details various real estate sales transactions, pursuant to which VesCor acquired approximately 5,800 acres of land in the Apex Industrial Park located near Las Vegas, Nevada. *Id.* ¶ 17-21. The Complaint alleges that VesCor paid a total purchase price of approximately $125,250,000, in the form of a $22,220,000 cash down payment plus four promissory notes in favor of Apex in the total sum of approximately $103,000,000. *Id.* ¶ 18. Further, it alleges that Apex set the sales price of the property without obtaining any appraisals,

*id.* ¶ 22, and that VesCor was required to purchase the Apex Industrial Park land through a

seller-financing arrangement with Apex as the financier, *id.* ¶ 23. The Receiver's Complaint

seeks the return of the $125,250,000 of investor funds under the Utah Uniform Fraudulent

Transfer Act ("UUFTA"). Utah Code Ann. § 25-6-5 (2006).

In the alternative, the Receiver's Complaint also alleges that Apex interfered with

VesCor's attempts to develop the property it bought from Apex, and that Apex is therefore liable

to the Receiver for those breaches of contract and/or breaches of the covenant of good faith and

fair dealing. Specifically, the Complaint alleges that Apex unreasonably and improperly

interfered with VesCor's attempt to develop the property on June 20, 2006, when David M.

Carver, a Manager of Apex, sent a letter to VesCor expressing that Apex would not support any

application by Southwick for a Special Improvement District to fund infrastructure at the Apex

Industrial Park. Complaint, ¶ 29. The Receiver alleges that the letter also told Southwick that

Apex would aggressively pursue remedies against Southwick and VesCor if Southwick

continued his attempts to seek such an application. *Id.* ¶ 30.

## II. Discussion

Apex makes three arguments in favor of dismissal: first, that the Receiver failed to

properly establish jurisdiction pursuant to 28 U.S.C. § 754; second, that Receiver fails to state a

fraudulent transfer claim; and finally, that the receiver cannot state a claim for breach of

contract. In the alternative, Apex argues that the Court should transfer venue to Clark County,

Nevada. The Court will address each in turn.

### 1. Rule 12(b)(1) Motion to Dismiss For Lack of Personal Jurisdiction

Federal receivers are granted authority to protect receivership "property, real, personal or mixed, situated in different districts" under 28 U.S.C. § 754. To preserve this authority, however, a receiver must "file copies of the complaint and [the] order of appointment in the district court for each district in which the property is located." *Id.* Failure to comply "divest[s] the receiver of jurisdiction and control over all such property in that district." *Id.* In addition, 28 U.S.C. § 1692 provides that when "a receiver is appointed for property, real, personal, or mixed, situated in different districts, process may issue and be executed in any such district as if the property lay wholly within one district." Read together, these Federal receiver statutes confer nationwide service of process. *See, e.g.*, *SEC v. Ross*, 504 F.3d 1130, 1145-46 (9th Cir. 2007); *SEC* v. *Bilzerian*, 378 F.3d 1100, 1104 (D.C.Cir. 2004). "It is well-established that when . . . a federal statute provides the basis for jurisdiction, the constitutional limits of due process derive from the Fifth, rather than the Fourteenth, Amendment." *See Peay v. BellSouth Medical Assitance Plan*, 205 F.3d 1206, 1210 & n.4 (10th Cir. 2000) (quoting *Republic of Panama v. BCCI Holdings (Luxembourg), S.A.*, 119 F.3d 935, 942 (11th Cir. 1997))). The Tenth Circuit does not follow the so-called "national contacts" approach to Fifth Amendment due process. *See Peay v. BellSouth Medical Assitance Plan*, 205 F.3d 1206, 1211 & n.4 (10th Cir. 2000) ("We are convinced that due process requires something more."). Nevertheless, the *Peay* court emphasized that "any constitutional due process limitations upon a federal . . . statute must be broadly defined" and "that it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." *Id.* at 1212-13. As a result, to have jurisdiction over Apex, the Court must find both that the Receiver satisfied the procedural requirements of the Federal statutes and that

jurisdiction over Apex comports with Fifth Amendment due process as delineated in *Peay*.

 In the present case, the documents attached to the Receiver's opposition to the present motion make clear that the Receiver complied with the procedural requirements of 28 U.S.C. § 754. Receiver's Memo in Opp., ex. A-D, dkt. 8 (March 27, 2009). The Court appointed the Receiver on May 5, 2008 and the Receiver made the necessary filings in the United States District Court for the District of Nevada, Southern Division, by May 14, 2008.

Apex contends that the Court does not have jurisdiction because "Mr. Wing was not appointed the Receiver of VesCor Development, LLC until November 17, 2008" and further because "[t]he Receiver filed nothing with the Nevada courts within ten days after the Modifying Order was entered on November 17, 2008." Apex Reply, at 4, dkt. 10 (April 17, 2009). Apex's argument misapprehends the effect of the Court's clarification of the Receivership Order entered on November 17, 2008. The original order appointing the receiver appointed Robert G. Wing Receiver of "Defendants Vescor Capital, Corp., Vescor Capital, Inc., Vescorp Capital, LLC, Vescorp Capital IV-A, LLC and all affiliated limited partnerships, corporations or other business entities." *See SEC v. VesCor Capital Corp., et al.*, No. 1:08-CV-00012, dkt. 25 (May 5, 2008). On August 1, 2008, the Covenant Group moved the Court to clarify the scope of the stay and provide a list of entities claimed as receivership entities. *Id.*, dkt. 41. The Court held oral argument on this motion on October 3, 2008, and entered an order on November 17, 2008, which modified the stay and included a lengthy list of named receivership entities to clarify the language found in the original order. *See* Order, at 3-4, dkt. 118. The Order explicitly stated that the "list is not exhaustive and other entities may be added pursuant to the Court's order as they

are discovered." *Id.* Because the November 17, 2008 Order merely clarified the scope of the existing receivership, there was no need for the Receiver to re-file with the Nevada court within ten days in order to retain jurisdiction pursuant to 28 U.S.C. § 754.

The remaining jurisdictional hurdle set by the Due Process Clause of the Fifth Amendment is easily cleared by the Receiver in this case. As noted above, the Tenth Circuit has stated "that it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." *Peay*, 205 F.3d at 1212-13. This is certainly not such a case. Under the facts of the present case, Apex simply cannot demonstrate that the exercise of jurisdiction "is so gravely difficult and inconvenient that [Apex] is at a severe disadvantage in comparison to his opponent. *Id.* at 1212 (quoting *Burger King Corp. v. Rudzewicz*, 471 I.S. 462, 478 (1985). As a result, the Court has jurisdiction over Apex.

## 2. Rule 12(b)(6) Motion to Dismiss For Failure to State a Claim

### a. Fraudulent Transfer Claim

Apex next argues that the Receiver's complaint fails to state a fraudulent transfer claim because he failed to provide sufficient facts to support his allegation that Southwick operated his entities as a Ponzi scheme and because he failed to sufficiently articulate the creditor/debtor relationship and the basis upon which the transfers, as they related to Apex, were fraudulent. *See* Apex Reply, at 8-9.

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Recently, in *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court held that to meet this threshold requirement, a plaintiff's

pleading must "nudge[] their claims across the line from conceivable to plausible." 550 U.S. 544,

570 (2007). Even more recently, in *Ashcroft v. Iqbal*,  the United States Supreme Court expressly

made the plausibility standard set out in *Twombly* applicable to "all cases." 129 S.Ct. 1937, 1953

(2009). In so doing, the Court reaffirmed that determining whether a complaint plausibly states a

claim for relief remains "a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense." *Id.* at 1950 (adding that "where the well-pleaded facts

do not permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged–but it has not shown–that the pleader is entitled to relief." (quotations and alterations

omitted)).

     For the purposes of a motion to dismiss for failure to state a claim, the Court's function

"is not to weigh potential evidence that the parties might present at trial, but to assess whether

the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be

granted." *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006) (quoting *Sutton v. Utah State*

*Scho. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). "In doing so, all facts

alleged in the complaint are taken as true and all reasonable inferences are indulged in favor of

the plaintiffs." *Id.* (quoting *GF Gaming Corp. v. City of Black Hawk, Colo.*, 405 F.3d 876, 881

(10th Cir. 2005)). This presumption applies to well-pleaded facts in the complaint, but not

conclusory allegations. *Id.* (quoting *Mitchell v. King*, 537 F.2d 385, 386 (10th Cir. 1976)).

     The Receiver's complaint seeks the return of the funds transferred from VesCor to the

Defendant pursuant to the Utah Uniform Fraudulent Transfer Act ("UUFTA"). Utah Code Ann.

§ 25-6-5 (2006). The UUFTA states that:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>> (a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>> (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor:
>>> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>> (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due .

*Id.* In addition, Utah's statutory scheme allows "actual intent" to be inferred from "certain indicia of fraud" enumerated in the statute, including where the "debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." *Id.* § 25-6-5(2)(i).

As a result, in a fraudulent transfer claim, a plaintiff need only plead and prove the transferor's, in this case VesCor's, intent to defraud. The plaintiff is not required to plead or prove that the transferee participated in the fraudulent activity. *See Rieser v. Milford (*In re *Chari)*, 276 B.R. 206, 213 (Bankr. S.D. Ohio 2002). Furthermore, good faith is an affirmative defense to a fraudulent transfer claim, and a complaint need not allege particular facts to defeat that defense. *Barclay v. Swiss Finance Corporation, Ltd.*, 347 B.R. 708, 714-15 (Bankr. S.D.Ca. 2006).

In addition, it is well-settled that an inference of fraudulent intent applies in Ponzi scheme cases. *See, e.g.*, *Wing v. Harrison*, 2004 WL 966298, at *2 (D. Utah Apr. 29, 2004); In re *Independant Clearing House*, 77 B.R. 843, 866 (D. Utah 1987). This inference is also supported by Utah's statutory scheme, which allows "actual intent" to be inferred if the debtor is insolvent. *See* Utah Code Ann. § 25-6-5(2)(I). This statutory "indicia of fraud" applies in Ponzi

9

scheme cases because it is well-established that Ponzi schemes are insolvent as a matter of law. *See Cunningham v. Brown*, 265 U.S. 1, 7-8 (1924); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).

Apex argues that the Court should make this inference of fraudulent intend applicable to fraudulent transfer claims against investors only. Apex's position, however, is not supported by other cases involving Ponzi schemes. For example, in *Scholes v. Lehmann*, the Seventh Circuit reasoned that the fraudulent transfer statute at issue in that case "makes no distinction among different kinds of recipients of fraudulent conveyances. Every kind is potentially liable." 56 F.3d at 761. Line-drawing between transferees is inconsistent with fraudulent transfer law's focus on the transferor, and not helpful at this stage of the proceeding. The Receiver has filed approximately forty cases against a variety of defendants he alleges benefitted significantly from Southwick's alleged Ponzi scheme. Without exception, each of the defendants that have come before the Court have argued that they dealt with Southwick at arm's length and operated completely outside of his fraudulent scheme. However, as noted above, whether a defendant took payments from VesCor in good faith and for reasonably equivalent value is an affirmative defense, the merits of which should properly be left for another day.

Finally, it is also well-settled that a Receiver can bring fraudulent transfer claims on behalf of defrauded investors. *See, e.g.*, Scholes, 56 F.3d at 754 ("The corporations, Douglas's robotic tools, were nevertheless in the eyes of the law separate legal entities with rights and duties. . . . The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's zombies. Freed from his spell they became entitled to the

return of the moneys–for the benefit not of Douglas but of innocent investors–that Douglas had made the corporations divert to unauthorized purposes."); *Wing v. Hammons*, No. 2:08-CV-00620, 2009 WL 1362389, at * 2 (D.Utah Mary 14, 2009) (listing cases approving of *Scholes*); *SEC v. Cook*, No. 3:00-CV-272-R, 2001 WL 256172, at * 2 (N.D.Tex. March 8, 2001) ("[W]hile the general rule is that the receiver may only bring actions that could have been brought by the entity in receivership, 'there are certain situations where the receiver is permitted to assert rights and defenses not available to the insolvent.").

First, the Complaint sufficiently alleges the existence of a Ponzi scheme. The Complaint in the present case states that VesCor Development, LLC, gave Apex more that $22 million in cash and approximately $103 million in notes. The Complaint provides a brief history of Southwick's operations from 1990 to 2006, the date the scheme allegedly collapsed. It alleges the manner in which Southwick borrowed and dissipated investor funds and lists VesCor's checkered history with the Utah Department of Commerce, Division of Securities, as well as Southwick's eventual 2008 conviction of nine counts of securities fraud for transactions occurring during the period he allegedly was operating VesCor as a Ponzi scheme.

Second, because the Complaint sufficiently pleaded the existence of Southwick's Ponzi scheme, the inference of fraudulent intent applies to transfers made by Southwick during the course of carrying out his scheme, including the transfers made by VesCor Development, LLC, a Receivership entity, pursuant to the three purchase agreements at issue in the present case. The well-pleaded facts contained in the Receiver's complaint allow the Court "to infer more than the mere possibility of misconduct." *Iqbal*, 129 S.Ct. at 1950. The Complaint describes Apex's

dealings with VesCor, and details the transfers of cash and credit notes made from VesCor to Apex pursuant to the ADL, Dry Water, and BDL contracts. The Complaint plausibly demonstrates that the Receiver is entitled to the return of these funds. Apex is free to establish, at a later point in the proceedings, that Apex took the payments made pursuant to these agreements in good faith and for a reasonably equivalent value. At this stage, however, the Receiver has done enough.

**b. Breach of Contract**

Apex argues that the Receiver's claims for breach of contract and breach of the covenant of good faith and fair dealing should be dismissed because of VesCor's prior breach of the underlying contracts. In general, "material failure of performance constitutes a breach that discharges the injured party from performance." *Resolution Trust Corp. v. Fed. Sav. & Loan Ins. Corp.*, 25 F.3d 1493, 1501 (10th Cir. 1994); *see also Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1023 (10th Cir. 2006). The Receiver, however, argues that the "No Interference" clauses in the ADL and BDL contracts survive VesCor's prior breach. Receiver Opp., at 15, dkt. 8 (March 27, 2009); *see Matrix Group Limited, Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 589 (8 th Cir. 2007) ("Where contract language speaks to a particular dispute, the Court gives those privately negotiated and agreed upon terms their full and plain meaning.").

The Receiver's Complaint alleges that Apex unreasonably and improperly interfered with VesCor's attempt to develop the property on June 20, 2006, when David M. Carver, a Manager of Apex, sent a letter to VesCor expressing that Apex would not support any application by Southwick for a Special Improvement District to fund infrastructure at the Apex Industrial Park.

Complaint, ¶ 29. The Receiver alleges that the letter also told Southwick that Apex would

aggressively pursue remedies against Southwick and VesCor if Southwick continued his

attempts to seek such an application. *Id.* ¶ 30.

      The Complaint references the three separate purchase agreements entered into by the

parties. *Id.* ¶ 18-21. Pursuant to the first contract, VesCor acquired the membership interest in

ADL1, LLC; CDL 3, LLC; IDL 9, LLC; and JDL 10, LLC. Apex Memo in Support, ex. 1-A , 1-

B, dkt. 6 (March 2, 2009) [ADL Contract]. The second contract covered VesCor's acquisition of

the membership interest in Dry Lake Water, LLC; Wet Utilities, LLC; Industrial Power Services,

LLC; Natural Energy Resources of Nevada, LLC; Digital Data Communications, LLC; Roads &

Railroads, LLC; Mining & Minerals, LLC; and Industrial Air, LLC. *Id.* ex. 2-A, 2-B [Dry Lake

Contract]. The final contract covered VesCor's acquisition of the membership interest in BDL 2,

LLC and EDL 5, LLC. *Id.* ex. 3-A, 3-B [BDL Contract]. Though not attached to the Complaint,

these documents are central to the Receiver's contract claims; accordingly, the Court may

consider them in evaluating the present motion to dismiss. *See Alvarado v. KOB-TV, LLC*, 493

F.3d 1210, 1216 (10th Cir. 2007) ("[O]n a 12(b)(6) motion to dismiss, 'the district court may

consider documents referred to in the complaint if the documents are central to the plaintiff's

claim and the parties do not dispute the documents' authenticity.'" (quoting *Jacobsen v. Deseret

Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002))).

      All three contracts were entered into by the parties on March 4, 2005 and refer to one

another as "Related Documents." *See* ADL Contract, § 6.4; Dry Water Contract, § 6.4; BDL

Contract, § 6.4. Each of the contract also features an "Entire Agreement" clause, yet refer to the

"Related Documents" as exceptions to that clause. *See* ADL Contract, § 11.1; Dry Water

Contract, § 11.1; BDL Contract, § 11.1. The provisions included in each contract, however, are

not identical. The Dry Water Contract contains a negative covenants provision which required an

both parties to approve to an enumerated list of "Major Decisions" and further required the

parties not to unreasonably withhold such approval. Dry Water Contract, § 1.5, at 14-17. The

parties also agreed that the Major Decisions provision would survive until the promissory notes

were paid in full and security obligations granted in connection with the transaction were

released. *Id.* The ADL and BDL contracts, in contrast, contain "No Interference" provisions

which prohibited the parties from engaging in "any activity that materially and adversely affects

the other Party's or its Affiliated Parties' current intended use or enjoyment of any of its real

property located in the Park." ADL Contract, § 10.11; BDL Contract, § 10.11. The ADL and

BDL contracts also provide a list of remedies available to the non-breaching Party, which the

non-breaching party may exercise "at its sole option and discretion." *Id.*  One of these options is:

"The non-breaching Party may bring a suit for damages for any compensable breach of or

noncompliance with any of the provisions of this Section 10.11." *Id.* Finally, the parties

expressly agreed that these "No Interference" provisions "shall survive the Closing and

termination of this Agreement until the day Seller, Purchaser and their Affiliated Parties no

longer own, in fee, title to any real property in the Park." *Id.*

      The Receiver's theory is that the three contracts should be read as "part of a single, over-

arching transaction." Receiver Opp., at 14. The Receiver's position is supported by that fact that

each of the documents refers to the other two as "Related Documents" and contain similar

provisions which list the other two agreements as exceptions to their "Entire Agreement" clauses. Furthermore, the Receiver points out that three transactions were closed simultaneously and are closely interrelated. *Id.*

For the purposes of the present motion, the Court must indulge the inference, favoring the Receiver, that the three contracts should be read as part of a single transaction. As a result, the "No Interference" clauses of the ADL and BDL contracts, and the "Major Decisions" clause of the Dry Water contract, are read as applying to the entire transaction. Each of those clauses contains specific language governing their survival. The "No Interference" clauses state that they "shall survive the Closing and termination of this Agreement until the day Seller, Purchaser and their Affiliated Parties no longer own, in fee, title to any real property in the Park." ADL Contract, § 10.11; BDL Contract, § 10.11. The Major Decisions clause similarly states that it survives until the promissory notes are paid in full and security obligations granted in connection with the transaction are released. *Id.* Dry Water Contract, § 1.5.

It is undisputed that VesCor still owned the property when David M. Carver sent his letter withdrawing Apex's support for a Special Improvement District. Accordingly, when all inferences are drawn in favor of the Receiver, the "No Interference" clause was still in effect at that time, regardless of VesCor's prior breach. Whether Apex acted properly under the terms of the contracts therefore presents questions for which there is not currently sufficient factual predicate to support a motion to dismiss.

### 3. Motion to Transfer Venue

Apex also urges the Court to transfer this matter to the federal district court in Nevada

pursuant to 28 U.S.C. § 1404. That sections provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Courts must nevertheless give great weight to a Plaintiff's choice of forum. *Texas Gulf Sulphur Co. v. Ritter*, 371 F.2d 145, 147 (10 th Cir. 1967) ("[U]nless the evidence and the circumstances of the case are strongly in favor of transfer the plaintiff's choice of forum should not be disturbed."). This general rule is magnified in a receivership action. *See, e.g.*, *Terry v. Walker*, 369 F. Supp. 2d 818, 822 (W.D.Va. 2005) (""[T]he Receiver's authority to serve process nationwide pursuant to 28 U.S.C. § § 754 and 1692 suggests that Congress intended a federal receiver's choice of forum to carry particular weight."); *Quilling v. Cristell*, No. , 2006 WL 1889155, at * 3 (W.D.N.C. July 7, 2006) (observing that the inconvenience to the parties must be "extreme" if it is "to justify thwarting the congressionally articulated policy that allows for extraterritorial jurisdiction in receivership cases"). In addition, several courts have also held that the interest of justice and judicial economy are best served by keeping the ancillary actions brought by a federal receiver in the same court in which the main action was filed. *See, e.g.*, *Terry*, 369 F. Supp. 2d at 823 ("The cases brought by the Receiver in this court share many similar issues, many of which this court has already ruled on. Keeping these related cases together in this district will therefore promote the uniform treatment of similar cases."); *Wing v. Storms*, No. 1:02-CV-127, 2004 WL 724448, at * 5 (D.Utah Feb. 5, 2004) ("There is a strong interest in having this court, which created the receivership, maintain litigation related to the receivership.").

In the present case, Apex cannot demonstrate that it's inconvenience is sufficiently

extreme to warrant transferring this case to Nevada. Apex has not shown that witnesses would be unavailable or would suffer undue hardship or difficulty due to having to travel for a proceeding in Utah. Furthermore, the main case was brought in Utah because Southwick ran the VesCor entities from his office in Ogden, Utah; Mr. Southwick was prosecuted in Utah State court; and the Receiver, a Utah resident, has brought approximately forty ancillary suits in this jurisdiction, all of which are related to each other, seek recovery of transfers from VesCor, and share many similar issues, including the nature of the VesCor scheme, and the facts surrounding the scheme that might have put recipients on notice of its suspicious operation. Accordingly, the Court finds no basis for transferring the Receiver's case against Apex to Nevada.

### III. Conclusion

For the foregoing reasons, Apex's Motion to Dismiss the Receiver's Complaint against him for lack of personal jurisdiction and for failure to state a claim is DENIED. Apex's request that this case be transferred to Nevada is also DENIED.

**IT IS SO ORDERED.**

DATED this <u>26th</u> day of August, 2009.

_____
Judge Dee Benson
United States District Court